UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
JOHN S. PEREIRA,

                Plaintiff,

      - against -                **MEMORANDUM AND ORDER**

UNITED STATES DEPARTMENT OF
JUSTICE; UNITED STATES TRUSTEES    16 Civ. 2599 (NRB)
PROGRAM; LORETTA LYNCH, Attorney
General for the United States;
CLIFFORD J. WHITE III, Director of
the United States Trustee Program;
WILLIAM K. HARRINGTON, United
States Trustee for Region 2,

                Defendants.
--------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


      Plaintiff John S. Pereira brings this action to challenge his
one-year suspension as a chapter 7 bankruptcy panel trustee in the
Southern and Eastern Districts of New York.  The suspension, first
imposed by the United States Trustee in connection with Pereira's
conduct at three Section 341(a) meetings in April and July of 2014,
was affirmed by the Director for the Executive Office of the United
States Trustee Program (the "Director") in March of 2016.
Plaintiff contends that the agency action violated: (1) the
Administrative Procedure Act, 5 U.S.C. § 701 <u>et seq.</u> (the "APA");
(2) a provision of the Bankruptcy Abuse Prevention and Consumer
Protection Act of 2005 providing for district court review of panel

trustee suspensions, 28 U.S.C. § 586(d)(2) ("Section 586(d)(2)");
and (3) Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.
§ 794 ("Section 504").

With the parties' consent, we consolidate plaintiff's request
for preliminary injunctive relief with the merits of the claims
asserted.  See Fed. R. Civ. P. 65(a)(2).  For the following
reasons, we conclude the administrative agency's action violated
neither the APA nor Section 586(2), and that the Rehabilitation
Act does not provide plaintiff with a private cause of action.
Therefore, we affirm the decision of the Director to uphold the
suspension.

## I.  BACKGROUND

### A. The United States Trustee Program[1]

The United States Trustee Program is a component of the
Department of Justice ("DOJ") responsible for overseeing the
administration of bankruptcy cases and private trustees under 28
U.S.C. § 586 and 11 U.S.C. § 101 et seq.  Harrington Decl. ¶ 3.
The Attorney General of the United States appoints a U.S. Trustee
for each of 21 regions of federal judicial districts.  28 U.S.C.
§ 581(a).  "Region 2" includes the judicial districts in the state

---

[1]     General factual background regarding the United States Trustee program is
drawn from the Declaration of William K. Harrington, the United States Trustee
for Regions 1 and 2, see ECF No. 39 ("Harrington Decl."), and from the statutory
and regulatory scheme governing the program, see 28 U.S.C. § 581 et seq.; 28
C.F.R. § 58.1 et seq.  These facts are undisputed.

of New York.   28 U.S.C. § 581(a)(2).   The Executive Office for United States Trustees in Washington, D.C., provides general policy and legal guidance, oversees the Program's substantive operations, and handles administrative functions.   Harrington Decl. ¶ 3.   The Executive Office, overseen by a Director whose authority derives from the Attorney General, provides administrative and management support to individual U.S. Trustee Offices in their implementation of the federal bankruptcy laws. Id.

The U.S. Trustees for each judicial district establish, maintain, and supervise panels of private trustees ("panel trustees") who administer cases commenced under chapter 7 of the Bankruptcy Code.   28 U.S.C. § 586(a)(1).   "To be eligible for appointment to the panel and to retain eligibility therefor," 28 C.F.R. § 58.3(a), the panel trustee must meet the qualifications listed in 28 CFR § 58.3(b).   Among these qualifications are that the trustee is "courteous and accessible to all parties with reasonable inquiries or comments about a case for which such individual is serving as private trustee" and "free of prejudices against any individual, entity, or group of individuals or entities which would interfere with unbiased performance of a trustee's duties."   28 C.F.R. §§ 58.3(b)(3) and (4).   Cases are assigned to active panel trustees using an "automated blind rotation system." Harrington Decl. ¶ 8.

### 1. Section 341(a) Meetings

Chapter 7 panel trustees have a range of responsibilities. See 11 U.S.C. § 704(a).  Among their responsibilities in every case is to convene and preside over a meeting of creditors pursuant to 11 U.S.C. § 341(a) (a "Section 341(a) meeting").  Harrington Decl. ¶ 5.  The debtor is statutorily obligated to appear at this meeting and answer under oath questions from the trustee and creditors regarding the estate.  11 U.S.C. § 343.  "The role of a chapter 7 trustee at Section 341(a) meetings is to conduct the meeting in an orderly, yet flexible manner, and to provide for a wide range of questions to the debtor as to matters affecting the debtor's financial affairs and conduct."  Harrington Decl. ¶ 5. In the Eastern District of New York, Section 341(a) meetings are held in large rooms in the United States Bankruptcy Courthouse in Brooklyn, New York.  Id. ¶ 7.  They are public proceedings, and the meeting rooms are frequently crowded with parties waiting to be examined.  Id.

### 2. The Language Assistance Plan

In conformity with an Executive Order requiring Federal agencies to develop and implement systems to provide needed services to persons with limited English proficiency, see Exec. Order No. 13166, 65 Fed. Reg. 50121 (Aug. 11, 2000), the U.S. Trustee Program has issued a Language Access Plan ("LAP").  See

AR530–AR540.[2]  The LAP requires chapter 7 panel trustees to notify people who possess limited English proficiency that, for participation at creditors' meetings, they may either use a telephonic interpreter service at DOJ expense, or secure a qualified interpreter of their choice at their own expense.  AR534. The Executive Office for United States Trustees also promulgates a Handbook for chapter 7 panel trustees that details trustees' roles and responsibilities.  <u>See</u> Handbook For Chapter 7 Trustees (Oct. 1, 2012), AR429–AR529 (the "Handbook").  The Handbook states that panel trustees "must" advise individuals with limited English proficiency of the available free interpreter service, and that these individuals "may not use family members, friends, the debtor's attorney or the attorney's employees" as an interpreter "unless the telephone service as the meeting site is not available to reach the interpreter services."  Handbook § 3.D.6, AR453.

### 3. Suspension or Termination of a Panel Trustee

A U.S. Trustee may suspend or terminate the assignment of new cases to a panel trustee pursuant to the procedures set out in 28 C.F.R. § 58.6.  The regulations enumerate a non-exclusive list of 14 grounds for suspension or termination of a panel trustee, including as relevant here:

---

[2]   Citations to "AR" refer to the Administrative Record underlying this action.  <u>See</u> ECF No. 40.

> (4) Failure to cooperate and to comply with orders, instructions and policies of the court, the bankruptcy clerk or the United States Trustee; . . .
>
> (6) Failure to display proper temperament in dealing with judges, clerks, attorneys, creditors, debtors, the United States Trustee and the general public; . . .
>
> (10) Failure to . . . appropriately conduct the 11 U.S.C. 341(a) meeting of creditors . . . .

28 C.F.R. § 58.6(a). A U.S. Trustee must deliver a written notification to the panel trustee stating the reasons for the suspension or termination and explaining the panel trustee's right to seek a review from the Director. 28 C.F.R. §§ 58.6(a)-(b). A panel trustee's request for review "shall be accompanied by all documents and materials that the trustee wants the Director to consider in reviewing the decision." 28 C.F.R. § 58.6(f). The U.S. Trustee must submit a response to the Director within 15 days, 28 C.F.R. § 58.6(g), and the Director "shall issue a written decision no later than 30 calendar days" thereafter, unless the panel trustee and U.S. Trustee agree to a longer period of time. 28 C.F.R. § 58.6(i). The Director's decision "shall determine whether the United States Trustee's decision is supported by the record and the action is an appropriate exercise of the United States Trustee's discretion." Id. This decision constitutes a final agency action. Id.

**B. Plaintiff's History as a Panel Trustee[3]**

John S. Pereira is a long-serving chapter 7 panel trustee. He was the first chapter 7 panel trustee ever appointed both the Southern and Eastern Districts of New York in 1979 and 1981, respectively, and has served continuously ever since.  Compl. ¶¶ 19-20.  Plaintiff has conducted more than 60,000 Section 341(a) meetings over the course of his over 35-year tenure.  Id. ¶ 21. He has served as a trustee in a wide variety of chapter 7 and chapter 11 cases.  Id.

Plaintiff is a veteran who served in the Vietnam War and suffered hearing loss during his military service.  Id. ¶ 28.  He wears two hearing aids to correct for his hearing loss, which are visible to the public.  Id. ¶ 30.  Plaintiff asserts that he "occasionally has difficulty hearing and questioning witnesses in an appropriate volume during the Section 341(a) Meetings, which occur in a crowded room with loud ambient noise," and that he "can correct for the disability with his hearing aids and/or when the speaker is properly amplified."  Id. ¶ 31.

**C. The Administrative Record**

**1. The Three Section 341(a) Meetings**

---

[3]     We base this description of plaintiff's personal history on the facts alleged in his Amended Complaint, ECF No. 33 ("Compl."), which have not been disputed.

The disciplinary action against plaintiff was taken in connection with his conduct during three Section 341(a) meetings he conducted in the Eastern District of New York in the cases of In re Castro, No. 14-43095-ess (Bankr. E.D.N.Y. 2014); In re Alvarez, No. 14-43096-nhl (Bankr. E.D.N.Y. 2014); and In re Cota-Birenbaum, No. 13-47467-ess (Bankr. E.D.N.Y. 2013).   See AR272–AR295 (docket sheets); AR264–AR267 (audio recordings); AR192–AR263 (transcripts).

### a. The Castro Meeting

Luz Castro filed a chapter 7 bankruptcy petition on June 18, 2014.  AR272.  At that time, her gross monthly income was $884.43 from work as a cleaner; her son-in-law was giving her an additional $400 per month; she did not own a home or car; her personal property was worth $2,830; and her only other asset was her interest in a class action lawsuit for injuries sustained as a result of "9/11 terrorism."   See Final Decision at 6, AR550.[4]   She owed her creditors $37,346.00.  Id.  Ms. Castro was represented by Attorney David Brodman.  AR272.

Plaintiff conducted Ms. Castro's Section 341(a) meeting on July 16, 2014.  AR192.  Attorney Renee Frank appeared with Ms. Castro in lieu of Mr. Brodman.  AR244.[5]   At the start of the

---

[4]   We rely on the Director's Final Decision, AR545–AR567, to summarize the debtors' bankruptcy petitions, which are not in the Record submitted to us.

[5]   Plaintiff called the Castro case before switching to a new track on the recorder.  As a result, the start of the Castro meeting appears at the end of

meeting, Ms. Frank requested a Spanish interpreter.  Id.  The trustee did not call an interpreter service, which would have provided over-the-phone assistance at Department of Justice expense.   The trustee took Ms. Castro's social security and identification cards and said, "[y]ou're an American citizen but you don't speak English? . . .  Didn't you have to take an English proficiency test to become a citizen?  So why can't you answer the questions in English?  I'm asking."  AR193.   Ms. Frank responded that "[s]he doesn't understand your question."  Id.  Plaintiff continued to question Ms. Castro, who did not respond: "Did you take an English proficiency test in order to become an American Citizen?  Yes or no?  You have to answer, ma'am.  Verbally."  Id. When Ms. Frank repeated that Ms. Castro did not understand English, plaintiff asked, "[h]ow is that possible, ma'am?"  AR194.   He continued to ask Ms. Castro questions in English about her ability to speak English, while Ms. Frank repeatedly explained that Ms. Castro did not speak English.  AR194–AR195.

Plaintiff then asked Ms. Castro's friend, who had accompanied Ms. Castro to the meeting, to act as an interpreter.   AR195. Through the friend, plaintiff again asked Ms. Castro how she passed the English proficiency test to become a citizen.  Id. After an exchange in Spanish between Ms. Castro and the friend, the friend

---

the transcript for the prior Alvarez meeting, AR226-AR244, which immediately preceded the Castro meeting in time but follows the Castro transcript in the Administrative Record.

explained that Ms. Castro "practiced the questions."   <u>Id.</u>
Plaintiff then asked, through the friend, when Ms. Castro became
a citizen.   <u>Id.</u>   After learning it was ten years ago, plaintiff
asked, "[a]nd in the next ten years, you never learned any English?
Ask her."   <u>Id.</u>

Plaintiff then tried to adjourn the meeting to the next month,
insisting that he wanted to know how Ms. Castro could sign papers
under penalty of perjury when she did not speak or read English.
AR196.  When Ms. Frank objected that he could not refuse to conduct
a meeting because a debtor does not speak English, plaintiff
responded, "[y]es, I can." AR198.  After Ms. Frank continued to
object to postponing the examination, and Ms. Castro's friend
offered to serve as translator, plaintiff said he would give Ms.
Castro's case a "second call" that day, but that Ms. Castro "has
to give me the answers" as to how her bankruptcy documents were
prepared "under oath, under penalty of perjury" if she does not
read English.  AR199.

Plaintiff reconvened the Castro meeting later that day.  He
did not immediately call the interpreter service.  AR 202.
Instead, he noted the appearance of Ms. Castro's friend and, using
the friend as an interpreter, asked "Ms. Castro, you're a
naturalized citizen, but your counsel tells me you don't understand
any English or very little English.  Which is it?  Ask her in
Spanish.  And then we'll get an interpreter."  AR203.  The friend

responded that Ms. Castro speaks "[a] little bit," and plaintiff said, "I want to ask you this, because it seems crazy.  How did you pass the English proficiency test ten years ago?  Ask her that."  Id.  The friend responded that Ms. Castro had memorized the questions.

Plaintiff then said he would call an interpreter after some "preliminary questions." AR204.  He proceeded to ask Ms. Castro about how her bankruptcy papers were prepared, and to whom she provided the information at Mr. Brodman's office.  Id.  Through the friend, Ms. Castro explained that she gave the information to her friend who was currently translating, and that her friend relayed it to Mr. Brodman.  Id.  Plaintiff asked multiple questions about how the translation process occurred in Mr. Brodman's office, and how Ms. Castro could have checked over her papers.  AR204-AR205.

Plaintiff then instructed his associate, Charles,[6] to get an interpreter.  AR206.  During his questioning of Ms. Castro through the interpreter, plaintiff continued to question Ms. Castro about her inability to speak English.  AR210.  At one point, plaintiff accused Ms. Castro of understanding one of his questions in English, and then said:

---

[6]    "Charles," whom we gather is named Charlie Sinisi, AR43-AR44, appears to play the role of Mr. Pereira's assistant at Section 341(a) meetings.  The Director found that "Charles . . . may have contributed to the trustee's misconduct in all three of these meetings."  Final Decision at 10 n.13, AR554.  However, Charles's conduct was not a basis for plaintiff's suspension.

I'll tell you right now.  I have a very difficult time
thinking that she's a credible -- that she's a
naturalized citizen, took an English proficiency test,
and claims she understands no English. . . .  And she's
been here for ten years. . . .  So her credibility to me
is very, very low.

AR213.

During his questioning through the interpreter, plaintiff

asked Ms. Castro about the class action lawsuit she was involved

in.  AR217.  Plaintiff would repeatedly ask a question, and then

ask another before the interpreter had finished translating.

AR217-AR221.  Ms. Castro testified that she had performed cleaning

work in the area of the 9/11 terrorist attacks in the month after

they occurred, and that she became sick.  AR217-AR219.  Plaintiff,

who initially thought Ms. Castro was suing the city, called her

lawsuit a "travesty."  AR220.  When he heard Ms. Castro explain

that she was suing the cleaning company that had employed her for

the work, he replied, "[b]ecause terrorists knocked down the Trade

Center, you're suing an ex-employer?"  Id.  When Ms. Castro was

unable to identify her attorney in that case, plaintiff said, "I

got a whole room of people who probably deserve discharges.  I'm

not going to waste more of their time."  AR221.

During plaintiff's final set of questions, when Ms. Castro

stated that she had left her job to travel to Colombia, plaintiff's

associate Charles interjected, "geez."  AR221.  Plaintiff

proceeded to ask how long she was there, but did not allow her to

answer because he asked additional questions.  AR221–AR222.  He then asked the question again, and Ms. Castro answered that she had been there 15 days because her mother and father had died. AR222.  Ms. Castro began to cry and cried throughout the remainder of the examination.  Id.

After the interpreter disconnected, plaintiff gave Ms. Frank some instructions and terminated the Section 341(a) meeting of creditors by saying, "[g]et the information."  AR224.[7]

### b. The Alvarez Meeting

Anthony Alvarez and his wife, Yvonne Alvarez, jointly filed for chapter 7 bankruptcy relief on June 18, 2014.  AR276.  At the time of their petition, Mr. Alvarez was a letter carrier with the United States Postal Service, and Mrs. Alvarez was a self-employed part-time babysitter.  See Final Decision at 14, AR558.  The Alvarezes owned a home, which they valued as worth $537,500 and was encumbered by a $508,891.87 mortgage.  Id.

Plaintiff conducted the Section 341(a) meeting of Mr. and Mrs. Alvarez on July 16, 2014, immediately prior to the Castro meeting.  As in the Castro meeting, the Alvarezes were represented by Mr. Brodman, but Ms. Frank stood in as counsel during the meeting.  AR225.  After swearing in the debtors, plaintiff asked whether either of the debtors had previously filed for bankruptcy.

---

[7]     Ms. Castro received a discharge of her debts on October 14, 2014, and her case was closed that day.  AR272.

AR228.   Mrs. Alvarez testified she had filed a chapter 7 case 13 years ago and had received a discharge of her debts.   AR228-AR229.

Plaintiff then asked about the debtors' history of home ownership.   AR229.   Mrs. Alvarez testified that she and her husband sold a residence in 2001 and bought a new home in 2001 or 2002, and that only her husband held the deeds to both properties. AR229-AR230.   Plaintiff proceeded to ask about what they paid for their current house, and when Mrs. Alvarez began to answer, plaintiff said, "How about I ask the guy whose . . . name is on the deed? . . . .   Wouldn't it make more sense?"   AR231.   When Mr. Alvarez stated that Mrs. Alvarez "does all my financial situations," plaintiff responded, "[h]ow did you have the ability to put a house in your name . . . if you have no financial abilities?"   AR231.   Plaintiff asked Mr. Alvarez a series of questions about the house.   He interrupted Mr. Alvarez's answers throughout.   AR227, AR231, AR232, AR233, AR235, AR236, AR237, AR242.   In particular, plaintiff asked Mr. Alvarez how the mortgage on their home was $508,000 when he said they paid $300,000 for the house.   Mrs. Alvarez started to explain, but was cut off by plaintiff, who said, "[h]ow much did you refinance for?   This is your second bankruptcy.   You know the system.   And now you're back again for both of you to not pay your creditors."   AR236.

Plaintiff asked the debtors for all their mortgage and refinancing papers and the deed to their house.   At the end of the

meeting, he said, "[s]o, your . . . testimony under oath is that even though you paid [$300,000] for the house and you now owe [$508,000], you didn't take any money out of the house?"  AR241. Mrs. Alvarez answered, "no," and plaintiff responded, "[d]o you understand how crazy that sounds?"  As Mrs. Alvarez began to respond, plaintiff said, "[m]a'am.  Ma'am. . . .  Do me a favor. Don't dig yourself a deeper hole."  AR243.  Mrs. Alvarez said she was not, and plaintiff responded, "[o]h, yes, you are.  Because what you're saying can't be truthful. . . . Okay?  It can't be. . . . It's illogical."  AR243-AR244.  He then announced that he wanted to refer the case "upstairs for a mortgage fraud investigation," and told Mrs. Alvarez, "[c]hange your attitude ma'am. . . .  You're a repeat filer.  Okay? . . .  You've taken advantage of the system once.  I don't know if you're going to let you do it again.  You're through.  See you next time."  AR244.[8]

### c. The Cota-Birenbaum Meeting

Nidia Cota-Birenbaum, a <u>pro se</u> debtor, filed for chapter 7 bankruptcy relief on December 16, 2013.  AR280.  Ms. Cota-Birenbaum asserted she owned no real property and had less than $10,000 worth of personal property; she listed three personal injury claims and a claim of succession to a rent-stabilized lease; she asserted she

---

[8]    Mr. and Mrs. Alvarez received a discharge of their unsecured debts on September 18, 2014, and the case was closed that day.  AR278.  Plaintiff never brought an action against them alleging fraudulent activity, and he did not file an objection to the discharge pursuant to 11 U.S.C. § 727(c)(1).

was an actress whose only income was from social security and food stamps; and she listed debts of $12,352.  Final Decision at 17, AR561.  Ms. Cota-Birenbaum disclosed on her bankruptcy petition that she had filed a prior case in Los Angeles, which had been dismissed.  Id.

Plaintiff conducted Ms. Cota-Birenbaum's Section 341(a) meeting on April 30, 2014.  AR246.  Ms. Cota-Birenbaum's husband, Mr. Birenbaum, identified himself and received plaintiff's permission to attend the meeting.  AR247.  At some point in the meeting, plaintiff asked questions about Ms. Cota-Birenbaum's prior bankruptcy case in California, and Ms. Cota-Birenbaum did not know the answers.  AR250-AR251.  When Mr. Birenbaum began to answer a question, plaintiff said, "[n]o.  You are not under oath, sir. . . .  I have to get the answers from her."  AR251.  Plaintiff asked whether the prior case was dismissed with or without prejudice.  Id.  Mr. Birenbaum asked plaintiff which document plaintiff would need to determine the answer.  Id.  At this point, Ms. Cota-Birenbaum said she was feeling ill and was taking pain medication because she had undergone a root canal procedure at a dentist the day before.  Id.  The following exchange occurred:

> DEBTOR COTA-BIRENBAUM: And I am sick, I'm medicated.
> They gave me medication for pain.  I'm not feeling well.
> So if I'm not reacting quickly it's because I'm not
> thinking right.  I'm very groggy and I can't remember
> some of the things right now.
>
> . . . .

16

THE TRUSTEE: This is a jurisdiction issue.  It has nothing to do with your memory.  Either -- If the dismissal was with prejudice, you can't file again in New York.  You can only file --

DEBTOR COTA-BIRENBAUM: Then it was --

THE TRUSTEE:  -- once every eight years.

DEBTOR COTA-BIRENBAUM: It was not dismissed with prejudice.

THE TRUSTEE: How do you know?

DEBTOR COTA-BIRENBAUM: Because I think that's what I remember.

THE TRUSTEE: Because -- You just told me that you're not -- you're not thinking very well, and you're -- and you don't feel well.

DEBTOR COTA-BIRENBAUM: Well, I'm trying to remember, and I'm telling you --

THE TRUSTEE: Well, show me that it was dismissed without prejudice.

DEBTOR COTA-BIRENBAUM: I mean, I just can't --

THE TRUSTEE:  There's got to be a -- There's got to be a document.

DEBTOR COTA-BIRENBAUM: I'll get you the documentation that you need as soon as possible.  I had no idea that I had to get that.  Otherwise, I would have had it already.

THE TRUSTEE: Ma'am, just answer my questions.  I don't want to get into a colloquy with you.  You've had a lot of experience with the court.  So, you're telling me you didn't think you had to know whether or not you were -- the dismissal was with prejudice or not?

AR252-AR253.  At some point, Ms. Cota-Birenbaum began to cry.

AR254.  Plaintiff stopped directing substantive questions to Ms.

Cota-Birenbaum and directed his associate, Charles, to check the applicable deadline for objecting to Ms. Cota-Birenbaum's discharge. AR254. Charles asked Mr. Birenbaum if he remembered his wife signing a stipulation for such a deadline. Mr. Birenbaum apparently handed up a stipulation, and Charles reported that "[w]e're going to need another one" in order to extend the deadline. AR255. Plaintiff asked Ms. Cota-Birenbaum to sign a stipulation so that the discharge deadline would not expire before she was fully questioned, and that he would then adjourn the examination until May. Id. He added:

> THE TRUSTEE: But understand, when you come back here in May, this is the third time. There are a lot of questions that have to be answered.
>
> DEBTOR COTA-BIRENBAUM: Oh, please don't yell at me. I have a headache.
>
> THE TRUSTEE: I'm not yelling at you. I'm being as civil as I --
>
> DEBTOR COTA-BIRENBAUM: Don't speak to me like that, please.
>
> THE TRUSTEE: Excuse me. I'm being a civil as I could possibly be.
>
> DEBTOR COTA-BIRENBAUM: Well, you're being very loud and aggressive.
>
> CHARLES: He's talking.
>
> THE TRUSTEE: I'm not being aggressive.
>
> DEBTOR COTA-BIRENBAUM: I'm going to throw up. (Crying.)
>
> CHARLES: You know what? This is ridiculous. . . . This has become ridiculous.

18

THE TRUSTEE:   This is absolutely ridiculous.

MR. BIRENBAUM: Because she's sick?

THE TRUSTEE: No.  Because she wants me to adjourn -- she wants me to abandon causes of action that -- that belong to the estate.

DEBTOR COTA-BIRENBAUM: Please, don't yell at me. Please.

MR. BIRENBAUM: (Indiscernible.)

THE TRUSTEE: Ms. Birenbaum --

DEBTOR COTA-BIRENBAUM: I have a headache.  (Crying.)

MR. BIRENBAUM: She signed the stip.  She's willing to sign another one.  What's the problem?

THE TRUSTEE:  I am not the one who just jumped up and walked out of the room.

MR. BIRENBAUM: But you --

THE TRUSTEE: I'm not the one who's crying.

MR. BIRENBAUM: Are you the one who's medicated after a two-and-a-half hour root canal?

THE TRUSTEE: I have no idea whether she's medicated or not.

DEBTOR COTA-BIRENBAUM: I told you.

MR. BIRENBAUM: She just told you, under an oath.

(Indiscernible; simultaneous speakers.)

CHARLES: Okay.  First of all, let's calm down.  Relax.

THE TRUSTEE:  Are you a disbarred attorney, sir?

DEBTOR COTA-BIRENBAUM: Oh, please.

MR. BIRENBAUM: No.

DEBTOR COTA-BIRENBAUM: Stop, please.

THE TRUSTEE:  Oh.  Well, are you admitted in New York?

DEBTOR COTA-BIRENBAUM:  Please, stop it.

MR. BIRENBAUM: No.

THE TRUSTEE: Okay.  Good.

MR. BIRENBAUM: I'm her husband, and I'm a codebtor.

THE TRUSTEE: All right.

CHARLES:  But you're not a debtor.

THE TRUSTEE: You're not a debtor.

CHARLES:  You're not a debtor.  She filed bankruptcy by herself.

DEBTOR COTA-BIRENBAUM:  Oh, please.  Oh.  Oh, stop. Please.

MR.  BIRENBAUM:   Okay.   They want you to sign a stipulation.

DEBTOR COTA-BIRENBAUM:  Quit screaming.  (Crying.)

THE TRUSTEE: I have at least a dozen questions.   At least.

CHARLES:  Here.  Sign this.

AR255-AR258.  Plaintiff announced an adjournment date of May 22. AR258.  Later, plaintiff asked Mr. Birenbaum a series of additional questions about Ms. Cota-Birenbaum's prior case.  AR260.  When Mr. Birenbaum did not know a certain answer, plaintiff told him, "you're not going to be much help in May."  Id.  The examination concluded with the following exchange:

THE TRUSTEE:  But get the documents.  And, sir, do not interfere when I'm asking the Debtor questions under oath.

MR. BIRENBAUM: You mean when you're raising your voice?

THE TRUSTEE: When I ask questions under oath and expect answers.  And I don't raise my voice.

DEBTOR COTA-BIRENBAUM: Yes, you did.

MR. BIRENBAUM: You did.

THE TRUSTEE: This is my normal voice.

CHARLES: May 22nd.  We'll see you later.

THE TRUSTEE: May 22nd.

DEBTOR COTA-BIRENBAUM: Let's go.

CHARLES: We have other people.

THE TRUSTEE: Yeah.

DEBTOR COTA-BIRENBAUM: Let's go.

MR. BIRENBAUM: Just don't mess with my wife.

. . . .

THE TRUSTEE: Don't mess with my wife?  What is this, the street?

MR. BIRENBAUM: Just act respectfully.

TRUSTEE: Is this the street?

MR. BIRENBAUM:  No. . . .  But it shouldn't be.

TRUSTEE: Mr. Birenbaum, move or I'll -- Please leave. Otherwise, I'll call the Marshals.

MR. BIRENBAUM: I'll be glad to.

. . . .

THE TRUSTEE: And I'll be glad to see you leave.

AR260-AR262.[9]

At no point during any of the Castro, Alvarez, or Cota-Birenbaum Section 341(a) meetings did the plaintiff explain that he was wearing a hearing aid, that he was hard of hearing, or that he might be speaking loudly inadvertently.

## 2. Complaints Regarding Plaintiff's Conduct

On May 12, 2014, the office of the United States Trustee for Region 2 received a letter from Ms. Cota-Birenbaum, the debtor in In re Cota-Birenbaum, complaining about plaintiff's conduct during her Section 341(a) meeting and requesting a replacement trustee. AR32-AR41.  On July 16, 2014, the U.S. Trustee received a letters from Renee Frank -- counsel for the debtors in the Castro and Alvarez Section 341(a) meetings -- and Wm. Ward Saxton -- another attorney present during those meetings -- complaining about plaintiff's demeanor and his failure to promptly contact an interpreter.  AR24-AR28.

Plaintiff was provided copies of the complaints and asked to respond.  He submitted letters dated May 22, 2014 (regarding the Cota-Birenbaum meeting) and July 24, 2014 (regarding the Castro and Alvarez meetings).  AR46-AR48; AR29-AR31.

## 2. The U.S. Trustee Gives Notice of Suspension

---

[9]   On March 5, 2015, the court ordered the case transferred to the Central District of California, and it was marked closed on March 12.  AR295.

On September 10, 2014, William K. Harrington, the U.S. Trustee for Region 2, sent plaintiff a notice of suspension stating his decision "to suspend the assignment of chapter 7 cases to him in the Eastern and Southern Districts of New York, for a period of one year, pursuant to 28 C.F.R. Part 58, § 58.6," with his reinstatement conditioned upon the completion of ten hours of diversity and sensitivity training.  AR1.  In an eight-page, single-spaced letter, the U.S. Trustee recounted the facts of each Section 341(a) meeting and explained the basis for his decision. AR1-AR8.  He concluded:

> My decision to suspend you for one year is based on my review of recordings of the Section 341(a) meetings in the Castro Case, the Alvarez Case and the Cota-Birenbaum Case. Your actions in the Castro Case were overly aggressive and arguably biased on the basis of Castro's limited proficiency in English, violative of Program policy, and so egregious that they warrant suspension in and of themselves. Your overly aggressive and unprofessional behavior in the Alvarez Case and the Cota-Birenbaum Case presents exacerbating factors.

AR4.  Specifically, the U.S. Trustee relied upon fourth, sixth, and tenth grounds to suspend or terminate a panel trustee listed in 28 C.F.R. § 58.6(a).  AR2.  The U.S. Trustee informed plaintiff of his right to request review from the Director pursuant to 28 C.F.R. § 58.6(b).  AR8.

### 3. Plaintiff Requests Review

By letter dated September 29, 2014, plaintiff, through counsel, timely requested review of the U.S. Trustee's decision.

AR52-AR60.    In   support   of   his   request   for   review,   plaintiff
submitted,  among  other  documents,  the  September  26,  2014  affidavit
of  John  C.  Castro,  an  attorney  unrelated  to  the  debtor  Ms.  Castro,
who  stated  that  he  was  present  at  the  Castro  Section  341(a)  meeting
and  that  "[a]t  no  time  did  Mr.  Pereira  attempt  to  be  aggressive  or
intimidate  the  debtor  and  in  my  opinion  he  was  speaking  loudly  as
he  always  does."   AR63.   The  U.S.  Trustee  submitted  a  response  on
October  14,  2014.   AR85-AR90.   Plaintiff  replied  on  October  24,
2014,  AR160-AR161,  attaching  an  additional  16  pages  of  supporting
documents,  AR162-AR187.

The    Administrative   Record   was   further   expanded   in   the
following  ways.    First,  on  November  18,  2014,  the  Director
requested  the  recordings  of  the  Section  341(a)  meetings  from  the
U.S.  Trustee,  AR189,  and  those  recordings  were  transcribed,  AR191.
In  addition,  plaintiff's  counsel  submitted  two  letters  of  support
addressed  to  the  Director.    The  first  letter  was  from  Attorney
Jonathan  TenBrink,  who  stated  in  part  that:

> I  have  not  personally  seen  the  complaint  made  about  Mr.
> Pereira,  however  I  do  know  when  it  was  made  and  was
> present  the  day  that  the  complaint  complained  about.
> Mr.  Pereira  was  certainly  brusk  [sic]  with  that
> particular  debtor;  however  that  seemed  to  be  because  of
> the  nature  of  the  testimony  and  how  unbelievable  that
> testimony  was.    I  recall  thinking  as  I  heard  the
> testimony  myself  that  it  seemed  ridiculous.

AR269.  The  second  letter  was  from  Attorney  Roger  N.  Schumann,  who
said  he  was  present  in  the  Section  341(a)  hearing  room  on  July  16,

2014, and alleged that at some point that morning, Attorney Saxon had interrupted plaintiff as he conducted a unnamed party's Section 341(a) meeting in a way that Ms. Schumann found "unnecessary," "instigating," and "disrespectful to the Court."  AR271.

The 30-day deadline for the Director to submit his final decision under 28 C.F.R. § 58.6(i) was extended several times with plaintiff's consent, from November 13, 2014, to September 25, 2015. See AR375-AR385.  During this period and after, plaintiff's counsel repeatedly requested an "in-person meeting with the Director." See AR402 (December 29, 2014 email requesting "a meeting in person in Washington, DC at [Director White's] convenience to address certain disputed facts regarding the subject Section 341 meetings"); AR407 (October 20, 2015 email requesting "an in-person meeting with the Director (or Lisa Tracy)"); AR404 (October 29, 2015 email seeking update).  On August 28, 2015, a representative of the Executive Office for the U.S. Trustee Program wrote to plaintiff's counsel that "no final agency action will be rendered in this matter prior to a contact from [Lisa Tracy, Deputy General Counsel in the Executive Office for United States Trustees] to let you know of the determination of your client's request for an in-person meeting with the Director." AR416.  On March 4, 2016, Lisa Tracy informed plaintiff's counsel that the Director had declined the request for a meeting, "[p]ursuant to his authority under 28 C.F.R. §58.6(h) to seek information relating to the request for

25

review from any party 'in the manner and to the extent the Director deems appropriate.'"  AR428.

Notably, throughout this period, the U.S. Trustee's suspension of plaintiff was never effected: he continued to be assigned new cases and to manage his existing caseload.  Harrington Decl. ¶ 13.

**4. The Director Affirms the U.S. Trustee**

On March 4, 2016, Director Clifford J. White upheld the U.S. Trustee's decision to suspend plaintiff.  Final Decision, AR545-567.  In a 23-page, single-spaced opinion, the Director discussed: the procedural history of the case; the applicable standard of review; the roles and responsibilities of chapter 7 panel trustees; the available grounds to suspend a panel trustee; the facts of the three Section 341(a) meetings in question; and an analysis of how the plaintiff's conduct in the meetings violated applicable policies and merited suspension.  Id.

The Director concluded that the record supported the U.S. Trustee's decision to suspend plaintiff pursuant to 28 C.F.R. §§ 58.6(a)(4), (6), and (10), based on two general grounds.  First, the Director found the record supported the U.S. Trustee's conclusion that plaintiff was "unprofessional, discourteous, overly aggressive and improper" in his treatment of the debtors. Id. at 6-19, AR550-AR563.

With respect to the Castro Section 341(a) meeting, the Director concluded that "[t]he trustee dealt inappropriately with Ms. Castro and his temperament was improper." Id. at 9, AR553. He wrote:

> The trustee's language has his tone were harsh, accusatory, demeaning and inappropriate throughout his examination of Ms. Castro. He continually asked her about or commented on Ms. Castro's inability to speak English. . . . The trustee did not show the debtor even a modicum of respect. . . . He made it clear that her case was not worth his time . . . . The trustee accused her of making a joke against the system. . . . This is a case where the trustee was repeatedly unprofessional, discourteous, overly aggressive and inappropriate in his treatment of the debtor.

Id. at 9-11, AR553-AR555. The Director further rejected plaintiff's efforts to blame Ms. Castro as an "uncooperative or recalcitrant debtor," not only because he concluded Ms. Castro was not recalcitrant, but also because the Handbook only authorizes the trustee to "remind" a recalcitrant debtor to be cooperative. Id. at 12, AR556. The Director additionally found that "the trustee's attempt in his Request for Review to blame the debtor for his misconduct supports, rather than undercuts, the United States Trustee's decision to suspend him." Id. Moreover, the suspension was "particularly justified" given that plaintiff's conduct took place in the public forum of a crowded Section 341(a) meeting room. Id. at 11, AR555.

The Director found the record likewise supported the U.S. Trustee's conclusion that plaintiff's conduct in the Alvarez

27

Section 341(a) meeting was similarly "unprofessional, inappropriate, and ineffective." Id. at 17, AR561. The Director noted that plaintiff inappropriately and counterproductively interrupted the debtors' answers throughout the examination, repeatedly made rude or inappropriate statements to and about the debtors, unfairly accused them of a lack of respect, and wrongly threatened them with a mortgage fraud investigation when nothing in the facts actually indicated mortgage fraud. Id. at 16-17, AR560-AR561.

Finally, with respect to the Cota-Birenbaum Section 341(a) meeting, the Director found the record supported the conclusion that plaintiff was "unprofessional, discourteous, and overly aggressive" in this context as well. Id. at 19, AR563.

In these ways, the Director explained, plaintiff "repeatedly violated his duty to treat debtors courteously and his questioning was wholly ineffective." Id. Thus, the U.S. Trustee "acted well within his discretion by suspending this trustee for a period of one year." Id.

Second, the Director found the record supported the U.S. Trustee's conclusion that plaintiff's failure to comply with the Language Access Plan, which independently justified the suspension. Id. at 19-21, AR563-AR565. The Director explained that, in the Castro meeting, plaintiff "violated the policy in two fundamental ways": first, plaintiff was required to promptly call

28

the interpreter service when Ms. Frank asked for an interpreter. Id. at 20, AR564.  Instead, he asked the debtor 17 more questions before calling an interpreter, including repeatedly questioning her in English about her English proficiency.  Id.  Second, he violated the LAP by using Ms. Castro's friend as an interpreter. Id.

The Director rejected plaintiff's efforts to "minimize his mistake" by claiming he committed only a technical violation:

> The trustee's assertion that he violated only a strict
> interpretation of the policy is akin to arguing that he
> had committed only a technical violation.  This is not
> so.  He likely embarrassed Ms. Castro, confused her, and
> made it more difficult to obtain useful information at
> the examination.  His error was significant and it is
> troubling that he fails to recognize this.

Id. at 20-21, AR564-AR565.

The Director considered and rejected plaintiff's additional arguments against suspension.  He found that plaintiff's length of service and history of good reviews "cannot justify misconduct by a senior trustee that would lead to administrative action against a less-experienced trustee.  Every trustee must be courteous to debtors and follow mandatory procedures."  Id. at 21, AR565. Moreover, he suggested plaintiff's long tenure may have mitigated the sanction imposed, as "the trustee's conduct here, mistreating three sets of debtors in a very public forum, and violating mandatory language assistance requirements in two distinct ways,

might well have supported a termination rather than a suspension."

Id.

The Director also addressed plaintiff's claim that his conduct in this meeting was caused by his hearing deficiency.

> The trustee also alleges throughout his Request for Review that he spoke loudly because he wears hearing aids. But, that does not excuse his discourtesy, his overly aggressive conduct or his inappropriate treatment of these debtors . . . . Indeed, the record does not establish that the trustee spoke in a loud voice due to a hearing deficiency. Not once during the examinations -- even when asked not to yell -- did the trustee suggest that he was speaking loudly due to any hearing deficiency. Thus, the record does not establish that this is why the trustee yelled at debtors. Even if it did, the words he spoke justify a suspension regardless of their volume. He was unfair, at times almost cruel. A hearing deficiency is insufficient to excuse the remarks and conduct at these hearings.

Id. at 22, AR566. On March 11, 2016, the U.S. Trustee directed plaintiff removed from the case assignment system in the Eastern and Southern Districts, effectively beginning his one-year suspension. Harrington Decl. ¶ 13. He remains on both panels and remains authorized to administer the cases previously assigned to him. Id. ¶¶ 13, 14.

## C. Procedural History in this Court

On April 7, 2016, plaintiff filed his first Complaint in this Court. ECF No. 1. In this Complaint, he sought relief solely on the basis of the APA and the Rehabilitation Act, and not Section 586(d)(2). He also moved for a temporary restraining order and a preliminary injunction to stay his one-year suspension until this

case was resolved.  See Mem. in Supp. of Prelim. Inj., ECF No. 34
("Mem.").  On April 8, we ordered expedited briefing and scheduled
a show-cause hearing, but we declined to issue a temporary
restraining order.  ECF No. 16.  The Government submitted its
opposition memorandum on April 14, ECF No. 38 ("Opp'n"), in which
it argued in part that because Section 586(d)(2) furnishes an
"adequate remedy in a court," plaintiff's APA-based claims were
improper and should be dismissed.  Opp'n 12-13.  Plaintiff replied
on April 18, 2016, ECF No. 37 ("Reply"), and amended his complaint
to add a cause of action based on Section 586(d)(2), ECF No. 33.

The show-cause hearing was held on April 20.  At that hearing,
the parties consented to our consolidating the request for
preliminary relief with the merits of the case, see Fed. R. Civ.
P. 65(a), subject to their having an opportunity to supplement the
Administrative Record.  The Government's submission of April 22,
2016, ECF No. 40, reflects the complete Administrative Record as
supplemented.  In addition, we received and reviewed the parties'
letters of April 25 and April 27, ECF Nos. 41-42, which principally
discuss Section 586(d)(2)'s "administrative hearing" requirement.

## II. DISCUSSION

### A. The Legal Framework

Plaintiff's Amended Complaint asserts a total of six claims
under three different statutes:

31

1) Violation of the APA based on the unauthorized
   delay in the Director's Final Decision (Count One);

2) Violation of the APA for making the suspension
   decision on an incomplete record (Count Two);

3) Violation of the APA for making a suspension
   decision that is arbitrary and capricious on the
   record presented (Count Three);

4) Violation of the Rehabilitation Act (Count Four);

5) Violation of the APA based on disability
   discrimination (Count Five);

6) Violation of 28 U.S.C. § 586(d)(2) based on the
   Director's failure to hold a "hearing on the
   record" (Count Six).

Two of those three statutes -- the APA and Section 586(d)(2) --
explicitly provide for a private right of action to seek review of
agency action in the district court,[10] but they contain different
legal standards.

The initial question is which statute and standard applies.
Judicial review under the APA is limited to agency actions "for
which there is no other adequate remedy in a court." 5 U.S.C. §
704; see Bowen v. Massachusetts, 487 U.S. 879, 903 (1988)
("Congress did not intend the general grant of review in the APA
to duplicate existing procedures for review of agency action.");

---

[10]     Plaintiff's reliance on the third statute, the Rehabilitation Act, is
twofold. First, as noted, Count Six is a stand-alone cause of action asserted
under that Act. Second, relying in part on the Rehabilitation Act, plaintiff
asserts in Count Three that the decision under review was discriminatory under
the APA. In the discussion infra, we hold that the Rehabilitation Act does not
authorize a private right of action in a case such as this and reject the
discrimination argument advanced under the APA.

Marlow v. U.S. Dep't of Educ., 820 F.3d 581, 583 n.3 (2d Cir. 1987).  When another statutory vehicle provides an adequate remedy in a court, claims brought under the APA are properly dismissed. See Natural Res. Def. Council v. Johnson, 461 F.3d 164, 173–75 (2d Cir. 2006); see also Sherman v. Black, 315 F. App'x 347, 349 (2d Cir. 2009) (summary order); Council of and for the Blind of Del. Cnty. Valley, Inc. v. Regan, 709 F.2d 1521, 1531–32 (D.C. Cir. 1983); Paganini v. U.S. Dep't of Agric. Sec'y of Agric., No. 12 CV 4615 (VB), 2012 WL 6822150, at *3 (S.D.N.Y. Dec. 10, 2012); Marinoff v. U.S. Dep't of Hous. & Urban Dev., 892 F. Supp. 493, 497 (S.D.N.Y. 1995), aff'd, 78 F.3d 64 (2d Cir. 1996).

We conclude that because Section 586(d)(2) provides plaintiff with an "adequate remedy in a court," it sets the appropriate legal standard and forecloses review under the APA.  Section 586(d)(2) of Title 28 provides in relevant part that:

> A trustee . . . who ceases to be assigned to cases filed under title 11 . . . may obtain judicial review of the final agency decision by commencing an action in the district court . . . after first exhausting all available administrative remedies, which if the trustee so elects, shall also include an administrative hearing on the record . . . .  The decision of the agency shall be affirmed by the district court unless it is unreasonable and without cause based on the administrative record before the agency.

Curiously, no mention of Section 586(d)(2) was made in connection with the U.S. Trustee's initial suspension, plaintiff's request for review, his sustained correspondence with the

Director's office, the Director's Final Decision, or plaintiff's initial complaint and motion for preliminary injunction. The first mention of Section 586(d)(2) was in the Government's opposition memorandum, in which defendants argued that the existence of this legal remedy precluded review under the APA. Opp'n 12-13. Plaintiff asserts that the defendants cannot now rely on Section 586(d)(2) because the Trustee Program relied on regulations that pre-date the enactment of Section 586(d)(2), and because these preexisting regulations were promulgated in part to make such suspensions reviewable under the APA. For the same reasons, plaintiff says, his claims "could not have been brought under 28 U.S.C. § 586(d)(2)."[11] Reply 2-3.

Plaintiff is correct that the U.S. Trustee and Director based their decisions on the regulations in 28 C.F.R. § 58.6; that those regulations were intended to make this type of suspension, previously unreviewable, reviewable under the APA;[12] and that the regulations pre-date the enactment of Section 586(d)(2).[13]

---

[11]    Elsewhere in his Reply (and in Count Six of his Amended Complaint), plaintiff relies on Section 586(d)(2) to assert that it entitles him to an on-the-record hearing, the absence of which requires remand and reversal. Plaintiff thus shuttles between the APA and Section 586(d)(2) as he perceives which gives him the greater litigation advantage.

[12]    See Procedures for Suspension and Removal of Panel Trustees and Standing Trustees, 62 Fed. Reg. 51740, 51742-43 (Oct. 2, 1997).

[13]    The regulations codified at 28 C.F.R. § 58.6 were promulgated in 1997. See 62 Fed. Reg. 51739 (Oct. 2, 1997). Section 586(d)(2) was enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 1231, 119 Stat. 23 (2005).

However, these facts shed no light on the adequacy of a cause of action provided by Congress in subsequently-enacted statute.  Nor does the absence of implementing regulations under Section 586(d)(2) alter this conclusion.  The statute is explicit.  It allows a suspended panel trustee to obtain judicial review of the final agency action in the district court, which "shall be affirmed by the district court unless it is unreasonable and without cause." It therefore furnishes an adequate remedy in a court that forecloses APA review, and plaintiff's duplicative claims under the APA must be dismissed for lack of subject matter jurisdiction. Accordingly, our task is to determine whether the Director's affirmance was "unreasonable and without cause."  28 U.S.C. § 586(d)(2).

Of the six claims alleged by plaintiff, only one (Count Six) is addressed to Section 586(d)(2).  The First, Second, Third, and Fifth Counts proceed under the APA.  We anticipate that plaintiff would raise these same arguments following a holding that Section 586(d)(2) controls the review process.  Thus, we will first discuss the hearing issue under Section 586(d)(2).  Next, we will discuss the merits of the various arguments currently raised under the APA, and finally we will discuss Count Four, the stand-alone Rehabilitation Act claim.

**B. Plaintiff did not "Elect an Administrative Hearing on the Record" Under Section 586(d)(2)**

We reject plaintiff's claim that the Director's refusal to hold a "face-to-face meeting" with plaintiff violates Section 586(d)(2) and requires reversal of his decision.  Pl.'s Ltr. of Apr. 25 at 1-2.  As noted above, Section 586(d)(2) contains a provision that, "if the trustee so elects," "an administrative hearing on the record" "shall" be among the administrative remedies available for review of a trustee's suspension or termination.

However, plaintiff did not elect this type of formal adjudication.  In his initial request for review, plaintiff did not ask for a hearing on the record.  He did identify witnesses who could testify "should they be called as witnesses" or "if called to testify," see AR52, AR55, AR58, AR161, but his conditional language evokes the Director's discretion to seek additional information "to the extent the Director deems appropriate," 28 C.F.R. 58.6(h).

Plaintiff's counsel's email of March 20, 2015, stating that the additional letters of support "underscore the need for a face-to-face meeting with my client to amicably resolve this appeal," AR268, once again evinces a request for an informal meeting, or perhaps even a negotiation.  Further correspondence is similar. See AR402 (December 29, 2014 email requesting "a meeting in person in Washington, DC at [Director White's] convenience to address certain disputed facts regarding the subject Section 341 meetings"); AR407 (October 20, 2015 email requesting "an in-person

meeting with the Director (or Lisa Tracy)"). And when Deputy General Counsel Lisa Tracy did inform plaintiff that the Director had declined his request for an in-person meeting, she explained the decision was "[p]ursuant to his authority under 28 C.F.R. §58.6(h)," not based on Section 586(d)(2). AR428.

Significantly, neither plaintiff nor his attorneys ever cited Section 586(d)(2) at any point in the administrative process, or, tellingly, in his initial complaint in this Court. The fact that plaintiff accused the Director of wrongly refusing a Section 586(d)(2) hearing only in his second complaint, amended after the Government noted the existence of this remedy at law, underscores that the parties, from the start, were proceeding under the regulations.[14]

We also reject plaintiff's rejoinder that his waiver of a right to hearing, to the extent it occurred, was insufficiently knowing and intentional to be valid. Pl.'s Ltr. Of Apr. 25 at 1 n.1. Plaintiff relies on Morris v. N.Y.C. Employees' Retirement System, 129 F. Supp. 2d 599, 608-09 (S.D.N.Y. 2001), which

---

[14]   In his April 25 Letter and at oral argument, plaintiff suggested that the more recently-enacted § 586(d)(2) must invalidate the preexisting regulations that do not require an administrative hearing on the record. We do not agree. This is not a case such as Lawrence + Mem'l Hosp. v. Burwell, 812 F.3d 257, 267-68 (2d Cir. 2016), in which a contradiction between a statute and regulation must be resolved in favor of the statute. Here, the statute and the regulation can co-exist. Section 586(d)(2) permits a suspended trustee the option of a formal hearing should he so choose. Alternatively, the trustee can proceed under the less formal regulations. The simultaneous existence of "formal" and "informal" modes of agency adjudication is neither unusual nor problematic. See 5 U.S.C. §§ 554(a), 704.

considered whether a plaintiff knowingly waived protectable rights under the Due Process Clause.  First, this case does not implicate any fundamental constitutional rights, as panel trustees do not have a property right in continued assignment of cases.  <u>See Richman v. Straley</u>, 48 F.3d 1139 (10th Cir. 1995); <u>Brooks v. United States</u>, 127 F.3d 1192 (9th Cir. 1997).  Second, plaintiff, himself a lawyer, was represented by counsel.

## C. The Director not Violate the APA or Section 586(d)(2)

Next, we address the merits of plaintiff's First, Second, Third, and Fifth Counts, which challenge the substance of the Director's Final Decision.  Because these claims are raised as violations of the APA, we first address them under the APA's "arbitrary and capricious" standard for review of agency action. For the same reasons that the Director's decision did not violate the APA, it also was not "unreasonable and without cause" under Section 586(d)(2).

### 1. Legal Standards

Section 706 of the APA authorizes the court to hold unlawful an agency's conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A) and (D).  An "agency action is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important

aspect of the problem, offered an explanation for its decision
that runs counter to the evidence before the agency, or is so
implausible that it could not be ascribed to a difference in view
or the product of agency expertise.'" Natural Res. Def. Council,
Inc. v. U.S. EPA, 658 F.3d 200, 215 (2d Cir. 2011) (quoting Motor
Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto.
Ins. Co., 463 U.S. 29, 43 (1983)).   The reviewing court must
confirm that the record shows the agency "examined the relevant
data and articulated a satisfactory explanation for its action,"
and that there is a "rational connection between the facts found
and the choices made." Id. (brackets and internal quotation marks
omitted).   Our inquiry "must be searching and careful," yet the
Court "may not substitute its judgment for that of the agency."
Id. (internal quotation marks omitted).[15]

### 2. The Director's Affirmance was not Arbitrary and Capricious

Based on the record before him, it was not arbitrary or
capricious for the Director to uphold the suspension.   The
administrative record -- totaling 574 pages and including
recordings and transcripts of the Section 341(a) meetings and 65

---

[15]    For our present purposes, Section 586(d)(2)'s legal standard -- that
"[t]he decision of the agency shall be affirmed by the district court unless it
is unreasonable and without cause based on the administrative record before the
agency" -- is substantially similar to the APA's "arbitrary and capricious"
test.   Given the similarity, and because the Director's decision must be
affirmed under either standard, we do not address the parties' arguments
regarding which standard is in fact more deferential to the agency.   Both
standards, at the least, require the reviewing court to defer to the agency
unless it concludes the agency's conduct was unreasonable.

pages of submissions by the plaintiff -- is comprehensive and voluminous.  The Director's Final Decision, 24 single-spaced pages in length, is detailed and exhaustive, and it avoided none of the issues raised.  His conclusions were also well-founded in the Administrative Record.  First, there is simply no doubt that plaintiff did not comply with the U.S. Trustee Program's Language Access Plan, and therefore failed to "comply with orders, instructions and policies of the . . . United States Trustee."  28 C.F.R. § 58.6(a)(4).  Second, there is more than sufficient evidence to support the Director and U.S. Trustee's conclusions that plaintiff was "unprofessional, discourteous, overly aggressive and improper" in his treatment of debtors, Final Decision at 19, AR563, and therefore that he failed to "display proper temperament in dealing with . . . debtors" and "appropriately conduct" the Section 341(a) meetings.  28 C.F.R. §§ 58.6(a)(6) and (10).  Having performed a "searching and careful" review of the record, including listening to the recordings of each meeting, we find no basis to conclude the Director's decision was arbitrary, capricious, or otherwise not in accordance with law.

### 3. Plaintiff's APA-Based Objections are Unavailing

Faced with the extensive Administrative Record, plaintiff alleges four bases upon which the Director's decision was

"arbitrary and capricious" or otherwise violated the APA.  We have considered these objections and find them unavailing.

### a. There was no "Prejudicial Unauthorized Delay"

The Director's failure to issue a decision within the timeframe set out in 28 C.F.R. § 58.6(i) is not a basis to vacate and remand his decision.  Plaintiff offers no authority to support his claim that agency delay, without more, is a basis to overturn an agency's decision once that decision is made.  The obvious remedy for agency delay is not a reversal or remand, but a court order to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).  See Office of Foreign Assets Control v. Voices in Wilderness, 382 F. Supp. 2d 54, 60 (D.D.C. 2005) ("The prevailing rule is that a claim that an agency has failed to comply with a statutory or regulatory deadline can give rise to an action to compel the agency to act under section 706(a)(1), but usually cannot support a claim to set aside the agency action under section 706(a)(2).").  Such an order to compel would, of course, be pointless here.

Moreover, we fail to see any harm from the delay.  Plaintiff consented to a series of adjournments covering approximately 11 of the 16 months of the allegedly prejudicial delay, and his suspension was stayed throughout the entire 16-month period, during which he continued to receive new case assignments.  We find no lack of irony in plaintiff's argument that the delay has

caused him "significant reputational harm and forced him to live under a cloud for much too long," Reply 4, as plaintiff initially requested a preliminary injunction to stay the suspension, which would leave the "cloud" in place, rather than an expedited ruling on the merits.  Instead, given that plaintiff was allowed to continue his work unabated, we view the delay as a form a preliminary relief pending his appeal to the Director.  In light of the exhaustive and thorough opinion ultimately issued by the Director, the delay in the issuance of the ruling and the decision to not impose the sanction while the appeal was pending are readily defensible.

### b. The Administrative Record was not Insufficient

We reject plaintiff's claim that deficiencies in the administrative record render the Director's decision arbitrary and capricious and require us to remand the matter for supplementation of the record.  Mem. 14-15.  Specifically, plaintiff complains that, in order to render a fair and reasoned decision, the Director should have met with Pereira to gather first-hand information about his disability and considered live testimony from plaintiff's proffered eyewitnesses and character witnesses.  We conclude, however, that this information was irrelevant, and to the extent it was relevant, the Director sufficiently considered it.

As an initial matter, plaintiff offers no authority supporting a requirement in this context that any evidence be

received live.  Instead, 28 C.F.R. § 58.6(f) places the burden on the suspended panel trustee to submit "all documents and materials that the trustee wants the Director to consider in reviewing the decision," and, thereafter, "[t]he Director may seek additional information from any party in the manner and to the extent the Director deems appropriate," 28 C.F.R. § 58.6(h).  Under this regime, plaintiff was free to submit any additional letters and affidavits that he saw fit, and he cannot reasonably argue that the director was required to further develop the record sua sponte.

To the extent plaintiff did submit supporting materials, the record is clear that all proposed evidence was considered and appropriate decision made as to whether live testimony was necessary.  The Director "carefully reviewed and considered" the Castro affidavit -- written two months after the Castro meeting -- and found it to be less detailed and less reliable than the more contemporaneous complaint letters from Attorneys Frank and Saxon -- submitted on the day of the meeting -- and the recordings and transcripts.  Final Decision at 13, AR557.  He also found the TenBrink and Schumann letters conclusory and unresponsive to the specific issues underlying the suspension.  Id. at 13 n.20, AR557. As for plaintiff's proffered character witnesses, who allegedly would have spoken to his "career and reputation," Reply 6, the Director accepted that plaintiff was a long-serving panel trustee with a history of good reviews, and indeed "weighed the trustee's

43

work as a panel trustee" as part of his analysis.  Id. at 21,
AR565.  He concluded, however, that plaintiff's conduct in the
three Section 341(a) meetings nevertheless merited suspension.
Ultimately, the Director's decisions regarding gathering more
evidence were reasonable and within his discretion.

### c. The Director did not Inappropriately Discount Explanatory Evidence

We also reject the related claim that the Director's decision
was arbitrary and capricious in that "all explanatory evidence was
discounted."  Reply 7.  At bottom, plaintiff's position is that
the director over-relied on the audio recordings -- which plaintiff
says are not the best evidence of what occurred in the meetings -
- and inappropriately discounted the accounts of Attorneys Castro,
TenBrink, and Schumann, as well as of Pereira himself.  Id.; Mem.
17-18.  As an initial matter, plaintiff is incorrect: the
recordings and transcripts are surely the best evidence of what
occurred, and there is no reason why the accounts or opinions of
other attorneys, or the submission of good character evidence, are
preferable sources of evidence.  Moreover, plaintiff's many
objections to how the Director weighed the record evidence is not
a basis for an arbitrary and capricious argument.  To upset the
Director's weighing of the evidence would impermissibly substitute
our judgment for that of the agency.

The similar arguments that the Director inappropriately discounted plaintiff's long history as a panel trustee and that his good behavior during the 16-month delay renders the rationale for the suspension "stale" are also meritless.  Plaintiff's good behavior, as well as his long history as a panel trustee, no doubt factored into the sanction imposed.  But that does not inoculate him from any sanction at all.

### d. The Decision was not Discriminatory

Plaintiff contends the Director's affirmance of the suspension was made on the basis of plaintiff's hearing disability, in violation of the Rehabilitation Act and U.S. Trustee Program regulations, and therefore "arbitrary and capricious" and "without observance of procedure required by law" under the APA.  This argument is wholly without merit.

First, the Administrative Record is clear that both the U.S. Trustee and the Director suspended plaintiff for <u>what</u> he said and did, not how loudly he said it.  As the Director explained, "the words he spoke justify a suspension regardless of their volume. He was unfair, at times almost cruel.  A hearing deficiency is insufficient to excuse the remarks and conduct at these hearings." Final Decision at 22, AR566.  Moreover, the Director concluded that plaintiff's failure to follow the LAP -- conduct completely unrelated to his hearing disability -- was an independent basis

for the suspension.  Mr. Pereira simply was not suspended "solely by reason of . . . his disability."  29 U.S.C. § 794(a).

In fact, plaintiff's hearing disability pre-dates his first appointment as a panel trustee over 35 years ago, and he has served as a panel trustee continuously ever since.  It strains credulity that plaintiff would be appointed with a hearing disability, re-appointed for decades, and only now suspended on the basis of his disability.

### 4. The Director's Affirmance was not Unreasonable and Without Cause

For the same reasons the administrative action was not arbitrary and capricious, we find it also was not "unreasonable and without cause based on the administrative record before the agency."  28 U.S.C. § 586(d)(2).

### D. The Rehabilitation Act does not Provide Plaintiff a Private Cause of Action

Plaintiff's Fourth Count alleges that the federal agency discriminated against him on the basis of his disability, in violation of the Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.  That statute provides in relevant part that:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . .

29 U.S.C. § 794(a).  We have already addressed plaintiff's substantive discrimination claim in the context of review of the agency's final action.  With respect to this stand-alone claim, the threshold issue is whether the statute provides a private cause of action whereby plaintiff may enforce Section 504 against the federal government in this context.  We conclude that it does not.

While Section 504(a)'s substantive nondiscrimination standard applies broadly to "any program or activity conducted by any Executive agency," Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794a(a)(2), expressly provides for private actions to enforce Section 504 only against "any recipient of Federal assistance or Federal provider of such assistance."

The United States Supreme Court has held that, in enacting this statute, Congress did not waive the federal government's sovereign immunity in suits for money damages, except where a federal agency is acting as a "Federal provider" of financial assistance.  Lane v. Pena, 518 U.S. 187, 193 (1996); see Sarvis v. United States, No. 99-0318, 2000 WL 1568230, at *2 (2d Cir. Oct. 19, 2000) (unpublished summary order).  In suspending plaintiff, the U.S. Trustee Program was not acting as a "Federal provider of financial assistance," and therefore plaintiff may not predicate

a claim for money damages on the Rehabilitation Act.[16]   See Lane, 518 U.S. at 194-95.

In addition to seeking money damages, which the Supreme Court has clearly foreclosed, plaintiff's claim under the Rehabilitation Act may also be read to seek declaratory or injunctive relief. Although neither the Supreme Court nor the Second Circuit has spoken on the issue, appellate and district courts have almost universally concluded that Section 504 of the Rehabilitation Act does not imply any private right of action, regardless of the relief sought, to challenge a federal agency's non-funding activities, given the limiting language of Section 505(a)(2) and the general availability of the APA to challenge final administrative actions that allegedly violate Section 504.   See

---

[16]   In contrast to Section 505(a)(2), Section 505(a)(1) of the Rehabilitation Act, 29 U.S.C. § 794a(a)(1), makes private enforcement actions available to "any employee or applicant for employment aggrieved by the final disposition" of "any complaint" made under Section 501 of the Act, 29 U.S.C. § 791, which prohibits discrimination on the basis of disability in employment decisions by the federal government.   In this way, Section 505(a)(1) expressly provides for private enforcement actions against the federal government as an employer.   See Lane, 518 U.S. at 193.

Plaintiff concedes he is not a federal employee, Compl. ¶ 114, and does not bring his claim under this provision.   Elsewhere, however, plaintiff argues that he may bring an employment discrimination action against the federal government under Section 504 because he is an independent contractor.   Mem. 20; Reply 9.   Even if plaintiff's conclusory assertion persuaded us that a private panel trustee is an independent contractor engaged by the Department of Justice (it has not), the authorities he relies on have found only that Section 504 authorizes employment discrimination suits by independent contractors against non-government defendants.   See Flynn v. Distinctive Home Care, Inc., 812 F.3d 422 (5th Cir. 2016) (independent contractor may sue private company contracted to provide healthcare services at United States Air Force base); Fleming v. Yuma Reg'l Med. Ctr., 587 F.3d 938 (9th Cir. 2009) (independent contractor may sue medical center receiving federal financial assistance).   They do not address the crucial question here of who may sue the government, which is limited to the finite waivers of sovereign immunity contained in Sections 505(a)(1) and(2).

<u>Clark v. Skinner</u>, 937 F.2d 123, 126 (4th Cir. 1991); <u>Cousins v. Sec'y of the U.S. Dep't of Transp.</u>, 880 F.2d 603, 605 (1st Cir. 1989); <u>Kinneary v. City of New York</u>, 358 F. Supp. 2d 356, 359 (S.D.N.Y. 2005); <u>Sai v. Dep't of Homeland Sec.</u>, --- F. Supp. 3d ----, No. 14-1876 (RDM), 2015 WL 8966920, at *8-10 (D.D.C. Dec. 15, 2015).  <u>But see</u> <u>Am. Council of the Blind v. Astrue</u>, No. C 05-04696 WHA, 2008 WL 1858928, at *7 (N.D. Cal. Apr. 23, 2008) (finding "jurisdiction under the Rehabilitation Act").  Guided by the principle that courts should not imply causes of action unless there is evidence Congress intended "to create not just a private right but also a private remedy," <u>Alexander v. Sandoval</u>, 532 U.S. 275, 286 (2001), we conclude the Rehabilitation Act does not provide plaintiff with an additional private cause of action in this context.

   Thus, because the Rehabilitation Act does not provide a stand-alone cause of action against a federal agency in this context, we dismiss Count Four for lack of subject matter jurisdiction. [17]  Fed.

---

[17]   Even if we found that the Rehabilitation Act furnished plaintiff with a private right of action to enforce Section 504(a) against the agency in this context, such a finding would require consideration of exhaustion of administrative remedies under C.F.R. § 39.170.  Plaintiff's effort to avoid an exhaustion requirement, Mem. 20; Reply 9-10, relies in part on inapposite caselaw.  <u>See</u> <u>Tuck v. HCA Health Servs. of Tenn., Inc.</u>, 7 F.3d 465, 470 (6th Cir. 1993) ("In the context of private employers and private employees, however, there is no exhaustion requirement.").  If we needed to reach the issue, we would be persuaded by the reasoning of <u>Cooke v. U.S. Bureau of Prisons</u>, 926 F. Supp. 2d 720, 731-34 (E.D.N.C. 2013), concluding that, even if Section 504 of the Rehabilitation Act implied a cause of action against a federal agency, a plaintiff must first exhaust the administrative remedies under 28 C.F.R. § 39.170 in order to bring a suit in the district court.

R. Civ. P. 12(b)(1); see Kinneary, 358 F. Supp. 2d at 360.  To the
extent that plaintiff relies on the substantive provisions of the
Rehabilitation Act, his remedy is limited to a challenge to the
agency action which we have already considered under Section
586(d)(2) and the APA and rejected.

### III. CONCLUSION

For the foregoing reasons, we affirm the Director's decision
to uphold the U.S. Trustee's imposition of a one-year suspension.
The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated:    New York, New York
          May  //  , 2016

                                NAOMI REICE BUCHWALD
                                UNITED STATES DISTRICT JUDGE